1

2

3

4

5

6         IN THE UNITED STATES DISTRICT COURT

7             FOR THE DISTRICT OF ARIZONA

8

9  Isaac J.W. Mullins,                    )   No. CV-06-1148-PHX-NVW (LOA)
                                          )
10            Petitioner,                 )   **REPORT AND RECOMMENDATION**
                                          )
11  vs.                                   )
                                          )
12  Dora B. Schriro, et al.,              )
                                          )
13            Respondents.                )
                                          )
14  _____      )

15         This matter is before the Court on Petitioner's Amended Petition for Writ of

16  Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (docket # 9)

17  Respondents have filed an Answer (docket # 13) to which Petitioner has replied.  (docket #

18  16)  In compliance with the Court's order, the parties have also submitted additional briefing

19  discussing *Cunningham v. California*, ___U.S.___, 2007 WL 135687 (Jan. 22, 2007) as it

20  pertains to Petitioner's challenge to his aggravated sentences.  (dockets ## 20, 22).

21  **I.  Factual and Procedural Background**

22         Petitioner's convictions and sentences giving rise to the pending § 2254 petition

23  are based on the following events:

24         During late 1990s, Petitioner had a two-year relationship with Sara Capp that

25  started when they were 17 and 16 years old, respectively.  (Respondents' Exhs. E at 21; G at

26  16-19; FF at 2) In April 1999, Petitioner moved to Twin Falls, Idaho but maintained a long-

27  distance relationship with Sara.  (Respondents' Exh. E at 2, G at 21-22, 24, 49, 51)  In

28  September 1999, Sara ended her relationship with Petitioner while he was visiting Phoenix.

1   Sara told Petitioner that she was involved with another person, Eric Weller. (Respondents'
2   Exh. E at 2; Exh. G at 22-23, 24, 49, 51; FF at 2)  During a month-long stay in Phoenix in
3   the fall of 1999, Petitioner threatened to kill himself because of Sara's decision to end the
4   relationship.  Petitioner also argued with Sara. (Respondents' Exh. E at 2; G at 23-26, 52-
5   56, 59-62)

6          Thereafter, on February 9, 2000, Petitioner flew to Phoenix. (Respondents' Exh.
7   E at 2, F at 1, FF at 4) He later admitted that he had planned to break Sara's neck and
8   brought with him a ski mask, gloves, duct tape, and a nylon rope to do so. (Respondents'
9   Exh. E at 2, FF at 2) After he arrived in Phoenix, Petitioner purchased pantyhose to use as a
10  mask. (Respondents' Exh. E at 2-3; FF at 2)

11         On the morning of February 10, 2000, Petitioner took a taxi cab to Sara's house.
12  (Respondents' Exh. E at 3; FF at 2)  Petitioner waited outside Sara's house until Sara and
13  her parents left for the day.  Petitioner then entered the house through a rear door he knew
14  was usually unlocked. (Respondents' Exh. E at 3, F at 1, G at 28-29) Once inside the house,
15  Petitioner took a knife from the kitchen and a hammer from the garage. (Respondents' Exh.
16  E at 3, F at 1-2, FF at 3)  Petitioner placed the knife in his back pocket and hid the hammer
17  in a dresser in the upstairs guest bedroom. (Respondents' Exh. E at 3, F at 2, FF at 2)
18  Petitioner later told police that he did not intend to use the weapons on Sara, but against her
19  parents if they came home early. (Respondents' Exh. E at 3, F at 2, FF at 3)  Petitioner
20  waited inside the house from 9:00 a.m. until 2:30 p.m. when Sara returned home from
21  school. (Respondents' Exh. E at 3, F at 2, FF at 3) When Petitioner heard Sara enter the
22  house, he hid upstairs wearing gloves, a ski mask, and a pantyhose mask. (Respondents'
23  Exh. at 3, F at 2, G at 28-30, FF at 3)  Sara went upstairs and changed clothes in the
24  bathroom.  When Sara came out of the bathroom, Petitioner attacked her from behind,
25  pushed her down, pinned her to floor, and tried to "snap her neck" by choking her.
26  (Respondents' Exh. E at 3, F at 2, G at 29-30, FF at 3)

27         While struggling with Petitioner, Sara felt the knife in Petitioner's back pocket.
28  She was able to get the knife from Petitioner's pocket and used it to cut his arm.

1  (Respondents' Exh. E at 3, F at 2, G at 30-31)  Petitioner seized the knife from Sara, then

2  dropped it, and Sara threw it down the stairs. Petitioner's and Sara's struggling moved them

3  into the guest bedroom.  (Respondents' Exh. E at 3, F at 2; G at 31; FF at 3) Sara managed

4  to pull off Petitioner's mask and discovered that Petitioner was the assailant.  (Respondents'

5  Exh. E at 3, F at 1, G at 32; FF at 3)

6         Petitioner then retrieved the hammer from the dresser drawer where he had left it

7  and struck Sara on the head "too many times for [Sara] to count" as if Petitioner were

8  "putting a nail through [Sara's] head."  (Respondents' Exh. E at 3-4; F at 2; G at 32-33; FF

9  at 3) Petitioner later told police that he wanted to "knock her out" so he would not have to

10  listen to her or watch her struggle.  (Respondents' Exh. E at 4, FF at 3) After Sara lost

11  consciousness, Petitioner retrieved the knife and then stabbed the Sara in chest by using the

12  weight of his entire body.  (Respondents' Exh. E at 4, F at 1-2, G at 33, 36, 38; FF at 3-4)

13         Petitioner then went to the bathroom to wash his hands and change out of his

14  bloody clothes.  (Respondents' Exh. E at 4, F at 2, G at 34, FF at 4)  Sara regained

15  consciousness and saw Petitioner changing clothes in the bathroom.  (Respondents' Exh. E

16  at 4; F at 2; G at 34; FF at 4) Petitioner asked Sara if she wanted him to call an ambulance to

17  which Sara responded affirmatively.  (Respondents' Exh. E at 4, F at 2; G at 35; FF at 4)

18  Rather than calling for help, Petitioner took Sara's cordless phone downstairs, took the keys

19  to her father's car, and drove away in her father's car.  (Respondents' Exh. E at 4, F at 2, G

20  at 35, FF at 4) After Petitioner left, Sara discovered that Petitioner had taken the phone from

21  upstairs.  She managed to negotiate the stairs to the first floor and called 911 from the

22  kitchen phone.  (Respondents' Exh. E at 4, G at 9, 36-37, FF at 4)

23         At 2:44 p.m., Avondale Police Lieutenant French arrived at the scene and found

24  Sara motionless on the floor in a pool of blood.  (Respondents' Exh. E at 4, F at 1, G at 9,

25  11, 37, FF at 4)  Sara told French her name and asked him to hold her hand.  (Respondents'

26  Exh. E at 4, F at 1, G at 10)  French tried to prevent Sara from losing consciousness by

27  engaging her in conversation until paramedics arrived.  (Respondents' Exh. G at 10-11)

28  After the paramedics and another police officer arrived, French went upstairs where he

1  found blood on the floors and walls, a discarded rubber glove, the hammer and knife used in

2  the attack, and a bloody cloth.  (Respondents' Exh. G at 12-24; F at 1)

3        Meanwhile, Petitioner went to his hotel, cleaned himself again, and checked out

4  of his room.  (Respondents' Exh. E at 5; F at 2, FF at 4)  Petitioner then drove to a shopping

5  mall and used a pay telephone to call 911 and report that "someone [was] dying" at Sara's

6  residence.  (Respondents' Exh. E at 5, F at 2, FF at 4)  Approximately ten minutes later,

7  Petitioner called Sara's current boyfriend, Eric Weller, who was living in California and told

8  him that he had killed Sara.  (Respondents' Exh. E at 5, 9-10, F at 2, FF at 4)

9        After making these calls, Petitioner drove to the desert where he unsuccessfully

10  attempted to burn the duffle bag and its blood-soaked contents which included a mask, nylon

11  rope, and duct tape.  (Respondents' Exh. E at 5, F at 2, G at 118-20)  Petitioner then

12  abandoned Sara's father's car in a high-crime area with the doors unlocked and the keys in

13  the ignition.  (Respondents' Exh. E at 5, F at 2, G at 124)

14        At 3:55 p.m., Sara arrived at St. Joseph's hospital where she received several

15  blood transfusions to replace the blood she had lost.  (Respondents' Exh. E at 5, G at 37, FF

16  at 4)  Sarah had surgery to treat a collapsed lung and insert a tube that remained in her chest

17  during her five-day hospital stay.  (Respondents' Exh. E at 5, G at 38, FF at 4)

18        Later that night, Petitioner checked into a motel in Phoenix and went to a strip

19  club.  (Respondents' Exhs. E at 5-6, F at 2, G at 112, 114-15)  Petitioner paid a dancer for

20  five lap dances, but left after two because he was feeling sick from having overdosed on

21  aspirin.  (Respondents' Exh. E at 5-6, F at 2)  Petitioner left his gym bag at the strip club.

22  Police later recovered the bag which contained Petitioner's round-trip plane tickets, check

23  book, and receipts from Phoenix ATMs.  (Respondents' Exh. E at 6, G at 115)

24        On February 12, 2000, police found Petitioner at the Maricopa County Medical

25  Center where he was receiving treatment for an aspirin overdose.  (Respondents' Exh. E at

26  6, F at 1-2, G at 113, J)  Petitioner confessed to Detective Wheeler that he traveled to

27  Phoenix to kill Sara by "snap[ping] her neck."  (Respondents' Exh. F at 1-2, G at 113-14,

28  127, FF at 4)  Petitioner described his plan to kill Sarah and the steps he took to achieve this

1  objective.  (Respondents' Exh. G at 113-14, 127)  On February 16, 2000, Petitioner gave

2  additional statements to Wheeler and another detective during a videotaped interview at the

3  Avondale Police Department.  (Respondents' Exh. G at 121-22, 127, Exh. K - cassette of

4  videotaped interview on February 16, 2000; Exh. L - transcript of February 16, 2000

5  videotape.)

6                    ***Charges, Plea, and Sentencing***

7            On February 22, 2000, the State of Arizona charged Petitioner with: Count 1 -

8  attempted first-degree murder, a class 2 dangerous felony; Count 2 - first-degree burglary, a

9  class 2 dangerous felony; and Count 3 - car theft, a class 3 felony.  (Respondents' Exh. A)

10  On October 17, 2000, Petitioner pleaded guilty to all three counts without a plea agreement.

11  (Respondents' Exhs. D at 3-4; F at 5; FF at 5) The trial court[1] advised Petitioner of the

12  possible sentences on all three counts and that those sentences could be ordered to run

13  consecutively for a total of 50.75 years' imprisonment.  (Respondents' Exh. D at 7-9, F at 5,

14  FF at 5-6) Petitioner told the court that he understood that his sentences could run

15  consecutively for up to 50.75 years and affirmed that he wanted to plead guilty to all three

16  offenses as charged.  (Respondents' Exh. D at 8-9)  During the change of plea hearing,

17  Deputy County Attorney Jeanette Gallagher informed the court that the prior prosecutor had

18  tendered a plea offer, but Petitioner rejected it.  She stated that:

19            I want the record to be clear.  I have had this problem in the past, that
          in this case there was a plea agreement made some time ago to the
20          Defendant by a different prosecutor.  The Defendant turned down the
          plea.  He got new counsel.  They asked for the plea back.  By then the
21          case was assigned to me. While Mr. Hanson asked me for it back, I
          refused.  There is no plea.  There will never be a plea in this case.
22          Just so the record is clear, that Mr.Hanson did in fact ask, Mr. Mullins
          had already turned it down and . . .I am not going to give it back.
23
   (Respondents' Exh. D at 14)
24
            The court then confirmed that the current prosecutor, Ms. Gallagher, had
25
   assumed the case from a previous prosecutor, that current defense counsel (Kenn Hanson
26

27  _____

28          [1]  The Honorable Louis A. Araneta presided.

1   and Jason Goldstein) had also assumed the case from a prior attorney (Kenneth Huls), and

2   that the plea offer was made by the former prosecutor to the former defense lawyer.

3   (Respondents' Exh. D at 14-15)  The court asked Petitioner whether he understood the

4   details related to the former plea offer, and Petitioner said that he did.  (Respondents' Exh. D

5   at 14-15) Petitioner also advised the court that he had rejected the plea offer that the former

6   prosecutor had offered and that he understood that the choice to accept or reject the plea

7   offer rested with him.  (Respondents' Exh. D at 15)

8              Petitioner's defense counsel then offered the following factual basis for all three

9   charged offenses:

10             In the event this matter had proceeded to trial, a summary of the
               evidence that would have been brought against Mr. Mullins is as
11             follows: That on or about February 9 of the year 2000, Mr. Mullins
               flew in from the state of Idaho, where he resided, to Phoenix,
12             Arizona.  On the next day, February 10th of the year 2000 at
               approximately 6 o'clock a.m. Mr. Mullins went to the victim's house .
13             . ., and surveilled the house waiting for the occupants to leave, which
               they did.  Once everyone had left the residence, Mr. Mullins
14             proceeded through the side gate into the backyard and entered the
               house through the back sliding glass door, which he knew was always
15             open.  Before that time, Mr. Mullins put on surgical gloves which he
               had procured in Idaho.  He also brought with him a backpack [that
16             contained a] ski mask, pantyhose mask, nylon cord, and duct tape.

17             Mr. Mullins proceeded to walk through the house, at which time he
               took from the kitchen a knife and from the garage a hammer.  At
18             approximately 2 o'clock in the afternoon, Mr.Mullins hears the victim
               enter the house, he dons his mask and hides in an upstairs bedroom
19             and then physically attacks and assaults the victim with a knife and
               then a hammer.  His mask is removed by the victim and she identifies
20             him as Isaac Mullins, her prior boyfriend.  At that time, Mr. Mullins
               leaves the residence, exiting through the garage.  He takes the keys . .
21             .to a '94 Chevrolet Camaro automobile without the permission of the
               owner, takes that car and leaves the residence.

22   (Respondents' Exh. D at 16-17)

23             The State supplemented the statement of facts with these details:

24             Your honor, I would add that in the Defendant's own statement he
               indicated that he had come to Arizona with the purpose in mind of
25             killing the victim, Sara Capp, that he stabbed her twice, once
               seriously in the chest.  He also hit her repeatedly in the head with a
26             hammer.  She was seriously injured as a result of this, the deadly
               weapon, the knife and the hammer, and she ended up being
27             hospitalized for several days, having to have chest tubes, cosmetic
               surgery, and so forth, and that the owner of the car that the Defendant

28

stole when he left was Sara Capp's father's, Douglas Capp.  Mr. Capp
had not given the Defendant permission to take the car.

(Respondents' Exh. D at 17) Petitioner agreed to the account of the incident with the

exception of the prosecutor's assertion that he had stabbed Sara twice, not once.

(Respondents' Exh. D at 18-20) The trial court reviewed the factual basis with Petitioner.

(Respondents' Exh. D at 19-22) Thereafter, the trial court found a factual basis for the

charges and found that Petitioner's use of the hammer and the knife made both the attempted

murder and armed burglary dangerous offenses.  (*Id.* at 16-22)  The court found that

Petitioner pled guilty knowingly, intelligently, and voluntarily, and accepted the pleas.  (*Id.*

at 22)

The State subsequently filed a sentencing memorandum requesting that the court

impose the maximum sentence on each count with the sentences to be served consecutively.

(Respondents' Exh. E at 7-16) In support of its request for consecutive sentences, the State

argued that under *State v. Gordon*, 161 Ariz. 308, 778 P.2d 1204 (1989), the armed burglary

was a separate act from the attempt to kill Sara.  (Respondents' Exh. E at 11-15) The State

based this argument on Petitioner's post-arrest statements which reflected that he had armed

himself with the knife and hammer to use against Sara's parents if they had arrived home

early.  (Respondents' Exh. E at 15)  Accordingly, Petitioner unlawfully remained in the

residence with the intent to commit an aggravated assault upon Sara's parents and would

have been guilty of armed burglary even if he had not tried to kill Sara.  (Respondents' Exh.

E at 11-15)

During the March 23, 2001 aggravation/mitigation hearing, Sara testified about

the crime, her injuries, and the impact they had on her life.  (Respondents' Exh. G at 15-45)

Detective Wheeler testified that Petitioner told him his intent in going to Sara's house on

February 10, 2000 was to snap Sara's neck.  (Respondents' Exh. G at 114) The State played

a 45-minute videotape of Petitioner's confession to the police.  (Respondents' Exh. H at 3-5,

Exhs. I, K, J, L) In this tape, Petitioner told Detective Wheeler that he planned to kill Sara

by breaking her neck.  (Respondents' Exh. J at 4-5, 21-22, 24-25)  He reported walking

1   around the house and picking up the knife and hammer to use on Sara's parents if they came

2   home unexpectedly.  (Respondents' Exh. J at 19)

3          On April 19, 2001, the court imposed an aggravated 21-year sentence for the

4   attempted first-degree murder conviction.  (Respondents' Exh. M at 59) Under A.R.S. 13-

5   702(C)(1), the trial court found the following aggravating factors: (1) Petitioner seriously

6   injured Sara; (2) Petitioner committed the crime in a heinous, cruel and depraved manner;(3)

7   Petitioner caused physical, emotional, and financial harm to Sara; (4) Petitioner laid in wait

8   for Sara; and (5) Petitioner left Sara to bleed to death.  (Respondents' Exh. M at 53-59)

9          The court also imposed an aggravated 19-year term on the armed burglary

10  conviction based on the following aggravating factors: (1) Petitioner engaged in extensive

11  planning; (2) Petitioner remained inside the victim's residence for an extended period

12  without permission of the homeowners; (3) Petitioner attempted to prevent the victim from

13  calling for help; and (4) Petitioner took steps to avoid attracting attention after the crimes.

14  (Respondents' Exh. M at 60-62)

15         Finally, the court imposed a mitigated three-year term of imprisonment for the

16  car theft conviction.  The court clarified that attempted first-degree murder and armed

17  burglary were dangerous offenses because they both involved the use and possession of a

18  deadly weapon, a knife, and a dangerous instrument, a hammer.  (Respondents' Exh. M at

19  62-63) The court ordered that the sentences on all three counts run consecutively.  (*Id.* at 63-

20  66)

21         ***Rule 32 Of-right Proceedings***

22         By pleading guilty, Petitioner waived his right to a direct appeal under Arizona

23  law.  However, he retained his right to seek review in an "of-right proceeding" under

24  Arizona Rule of Criminal Procedure 32.  Accordingly, on May 31, 2001, Petitioner filed a

25  notice of post-conviction relief under Ariz.R.Crim.P. 32.  (Respondents' Exh. N)  Petitioner

26  subsequently filed a petition raising two claims: (1) the trial court violated A.R.S. § 13-116

27  by imposing consecutive sentences for  attempted first-degree murder, Count 1, and first-

28  degree burglary, Count 2; and (2) his first defense attorney, Kenneth Huls, was ineffective

1  because he rejected a plea offer without communicating its terms to Petitioner before the

2  offer expired. (Respondents' Exh. O at 2-8)

3      On January 9, 2004, the trial court denied the Rule 32 petition.  (Respondents'

4  Exh. Q) The court ruled that A.R.S. § 13-116 did not prohibit consecutive prison sentences

5  for Petitioner's convictions for attempted first-degree murder and first-degree burglary.

6  (Respondents' Exh. Q at 2-4)  The court also found that Petitioner failed to establish that his

7  first lawyer, Kenneth Huls, was ineffective for failing to convey a plea offer to Petitioner

8  before it expired.  The court explained that:

9  > In contradiction to his acknowledgment in court that his prior attorney
10 > had presented the State's plea offer to him, advised him regarding the
   > plea offer, and that he had chosen to reject it [reporter's transcript of
11 > 10/17/2000 at Pages 14-15], Defendant now claims in his affidavit
   > that it was his attorney and not he who rejected the plea offer.
12 > Noticeably absent is any affidavit by his former counsel, Ken Huls.
   > The Defendant's affidavit is contradicted by his statement in court.
13 > He has presented no objective evidence to support a colorable claim
   > of ineffective assistance.

14 (Respondents' Exh. Q at 4)

15                        ***Appeal of Rule 32 of-Right Proceeding***

16     On February 6, 2004, Petitioner sought review of the trial court's denial of his

17 Rule 32 proceedings in the Arizona Court of Appeals case number 1 CA-CR-04-0077

18 PRPC.  (Respondents' Exh. R) Petitioner raised the following issues: (1) the imposition of

19 consecutive sentences for attempted first-degree murder and first-degree burglary violated

20 A.R.S. § 13-116; and (2) Petitioner's first lawyer, Kenneth Huls, was ineffective in failing to

21 convey the State's plea offer to Petitioner before it expired.  (Respondents' Exh. R at 3-16)

22     While this appeal was pending, on June 24, 2004, the Supreme Court issued

23 *Blakely v. Washington*, 542 U.S. 296 (2004).  On August 16, 2004, Petitioner requested

24 leave to file a supplemental petition for review and submitted a supplemental petition which

25 relied upon *Blakely* to challenge the voluntariness of his pleas, the imposition of aggravated

26 sentences based upon facts not found by a jury, and the ineffectiveness of trial counsel for

27 failing to advise him of his Sixth Amendment right to have a jury find aggravating facts

28 beyond a reasonable doubt.  (Respondents' Exhs. T, U)

The Arizona Court of Appeals suspended review in 1 CA-CR-04-0077-PRPC and remanded the matter to the trial court to permit Petitioner to file a supplemental petition for post-conviction relief raising a *Blakely* claim. (Respondents' Exh. V)

### Supplemental Petition for Post-Conviction Relief

On September 3, 2004, Petitioner filed a supplemental petition for post-conviction relief raising the following claims: (1) his guilty pleas were not "voluntarily and intelligently made because he was not told that he had a right to have a jury determine the truth of any aggravators alleged by the State, that any such aggravating facts must be found beyond a reasonable doubt, and that he had waived these rights by pleading guilty;" (2) "that his sentence was unconstitutional because the court [reached] its decision using facts that were neither admitted by the defendant, nor found by a jury, thus violating the defendant's Sixth Amendment right to a trial by jury as interpreted in *Blakely v. Washington*;" and  (3) "that defendant's appointed counsel ineffectively represented him."  (Respondents' Exh. W)

On December 23, 2004, the trial court issued its ruling which: (1) rejected Petitioner's claims that trial counsel was ineffective in failing to predict *Blakely*; (2) rejected Petitioner's challenge to the voluntariness of his guilty pleas; but (3) granted post-conviction relief on Petitioner's *Blakely* claims with respect to the aggravated sentences imposed on Counts 1 and 2.  (Respondents' Exh. Y) The trial court employed the harmless-error standard articulated in *State v. Murdaugh*, 209 Ariz. 19, 97 P.3d 844 (2004) to determine that the Sixth Amendment violation warranted a jury trial on the aggravating circumstances related to Petitioner's attempted first-degree murder and burglary convictions. (Respondents' Exh. Y at 3-4)

### Appeal of Supplemental Rule-32 Proceedings and Other Events

On December 29, 2004, the State sought review in the Arizona Court of Appeals of the trial court's order granting post-conviction relief regarding the aggravated sentences on Counts 1 and 2, thereby initiating a new appeal, 1 CA-CR-04-1051-PRPC. (Respondents' Exh. Z) Petitioner opposed the appeal.  (Respondents' Exhs. AA, BB)

While the State's petition for review was pending in 1 CA-CR-04-1051-PRPC, a different panel of the Arizona Court of Appeals denied review from the trial court's denial of the original petition for post-conviction relief in 1 CA-CR-04–077-PRPC.  (Respondents' Exh. CC) On March 24, 2006, the Arizona Supreme Court concluded the post-conviction proceedings in 1 CA-CR-04-0077-PRPC by denying Petitioner's petition for review. (Respondents' Exhs. EE, HH)

In the meantime, on December 27, 2005, the Arizona Court of Appeals issued its decision in 1 CA-CR-04-1051-PRPC reversing the trial court's ruling which had granted post-conviction relief on *Blakely* grounds with respect to Petitioner's aggravated sentences on Counts 1 and 2.  (Respondents' Exh. FF)  The appellate court reinstated Petitioner's original aggravated sentences explaining that: (1) because Petitioner did not timely object to judicial fact-finding during sentencing, the trial court erred in applying the harmless error standard set forth in *Murdaugh* rather than the fundamental-error test articulated in *State v. Henderson*, 210 Ariz. 561, 115 P.3d 601 (2005); (2) in accordance with the Arizona Supreme Court's holding in *State v. Martinez*, 210 Ariz. 578, 115 P.2d 618 (2005), the existence of one *Blakely*-compliant aggravating factor authorizes the judge to find and consider additional aggravating factors to determine which sentence to impose within the statutory range; and (3) Petitioner failed to demonstrate that any *Blakely* error was prejudicial because no reasonable jury could have failed to find at least one of each crime's cited aggravating circumstances beyond a reasonable doubt.  (*Id.* at 11-13)

On February 17, 2006, Petitioner petitioned the Arizona Supreme Court for review which was denied on June 28, 2006.  (Respondents' Exhs. GG, II)

### ***Petition for Writ of Habeas Corpus***

Thereafter, on April 5, 2006, Petitioner filed a Petition for Writ of Habeas Corpus which he subsequently amended.  The Amended Petition for Writ of Habeas Corpus raises the following claims:

> **Claim 1:** The trial court's imposition of aggravated sentences on
> violates the Sixth Amendment's jury trial guarantee;

**Claim 2:** Trial counsel rendered ineffective assistance because: (a) Kenneth Huls failed to communicate to Petitioner the State's plea offer of a stipulated 21-year sentence before the offer expired; and (b) counsel Kenn Hansen and Jason Goldstein incorrectly informed Petitioner that there was "no way" he would be sentenced to a prison term greater than 15 years and receive consecutive sentences;

**Claim 3:** Petitioner's consecutive sentences for Counts 1 and 2 violate the Double Jeopardy Clause;

**Claim 4:** The trial court's ruling that A.R.S. § 13-116 did not prohibit the imposition of consecutive sentences for Counts 1 and 2 amended the first-degree burglary charge after sentencing in violation of (a) Petitioner's right to a grand jury indictment; and (b) Petitioner's Sixth Amendment right to notice; and

**Claim 5:** The Arizona Court of Appeals was biased against Petitioner because it reversed the trial court's order granting post-conviction relief.

(docket # 9)

## II.  Timeliness under the AEDPA

Respondents concede that the Petition was filed within the AEDPA's time limits. 28 U.S.C. § 2244.  The Court, therefore, will not address this issue further.

## III.  Exhaustion/Procedural Default

Respondents concede that Petitioner properly exhausted claims 1, 2a, and 4b and that the Court should reach the merits of those claims.  However, Respondents assert that Petitioner procedurally defaulted the following claims because he never presented them to the state courts:

(1) Counsel Kenn Hansen and Jason Goldstein incorrectly informed Petitioner that there was "no way" he would be sentenced to a prison term greater than 15 years and receive consecutive sentences (Claim 2b);

(2) The trial court's imposition of consecutive prison sentences for Counts 1 and 2 violated the Double Jeopardy Clause (Claim 3).

(3) The trial court's ruling that A.R.S. § 13-116 did not prohibit the imposition of consecutive sentences for Counts 1 and 2 amended the first-degree burglary charge after sentencing in violation of Petitioner's right to a grand jury indictment (Claim 4a); and

(4) The Arizona Court of Appeals was biased against Petitioner because it reversed the trial court's order granting post-conviction relief.

1  (docket # 13)  The Court will consider whether the foregoing claims are procedurally

2  defaulted.

3                    **A. Exhaustion and Procedural Default**

4              The Supreme Court has repeatedly held that state courts should be given the first

5  opportunity to consider a state prisoner's assertion that his state conviction and/or sentence

6  violates federal law. *Williams v. Taylor*, 529 U.S. 420, 436-37 (2000); *O'Sullivan v.*

7  *Boerckel*, 526 U.S. 838, 842 (1999); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

8  Before a federal court may grant a state prisoner habeas corpus relief, the prisoner must

9  exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1);*Williams v. Taylor*,

10 529 U.S. 420, 436-37 (2000); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Coleman v.*

11 *Thompson*, 501 U.S. 722, 731 (1991).  The requirement that state prisoners first present their

12 claims in federal court, or exhaust their state court remedies, is intended "to prevent

13 'unnecessary conflict' between courts equally bound to guard and protect the rights secured

14 by the Constitution."  *Picard v. Connor*, 404 U.S. 270, 275-276 (1971).  In view of the

15 exhaustion requirement, the federal court will not entertain a petition for writ of habeas

16 corpus unless the state prisoner has exhausted his federal claims in state court.  *Pliler v.*

17 *Ford*, 542 U.S. 225, 230 (2004); *Rose v. Lundy*, 455 U.S. 509, 521-22 (1982).

18             To properly exhaust a claim in the state courts, a petitioner must have afforded

19 the state courts the opportunity to rule upon the merits of his federal claims by "fairly

20 presenting" them to the state's "highest" court in a procedurally appropriate manner.

21 *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)

22 (stating that "[t]o provide the State with the necessary 'opportunity,' the prisoner must 'fairly

23 present' her claim in each appropriate state court . . . thereby alerting the court to the federal

24 nature of the claim.").  The Ninth Circuit Court of Appeals has concluded that, in Arizona,

25 in the context of a petitioner who has not been sentenced to death, the "highest court"

26 requirement is satisfied if the petitioner has presented the claim to the Arizona Court of

27 Appeals either on direct appeal or in a petition for post-conviction relief.  *Swoopes v.*

28 *Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999); *Beyart v. Schriro*, 2006 WL 1305275, * 3 n. 2

1   (D.Ariz. 2006) ("Arizona law no longer requires that a life sentence case be appealed to the

2   Arizona Supreme Court.")

3           To fairly present his claims, a petitioner must describe both the operative facts

4   and the federal legal theory.  *Reese*, 541 U.S. at 28.  It is not enough that all of the facts

5   necessary to support the federal claim were before the state court or that a "somewhat

6   similar" state law claim was raised.  *Reese*, 541 U.S. at 28 (stating that a reference to

7   ineffective assistance of counsel does not alert the court to federal nature of the claim).

8   Rather, the habeas petitioner must cite in state court to the specific constitutional guarantee

9   upon which he bases his claim in federal court.  *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th

10  Cir. 2001).  Similarly, general appeals to broad constitutional principles, such as due

11  process, equal protection, and the right to a fair trial, are insufficient to establish fair

12  presentation of a federal constitutional claim.  *Lyons v. Crawford*, 232 F.3d 666, 669 (9th

13  Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*,

14  223 F.3d 982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal

15  to a constitutional guarantee," such as a naked reference to "due process," or to a

16  "constitutional error" or a "fair trial").  Similarly, a mere reference to the "Constitution of

17  the United States" does not preserve a federal claim.  *Gray v. Netherland*, 518 U.S. 152,

18  162-63 (1996).  Even if the basis of a federal claim is "self-evident" or if the claim would be

19  decided "on the same considerations" under state or federal law, the petitioner must make

20  the federal nature of the claim "explicit either by citing federal law or the decision of the

21  federal courts . . . ."  *Lyons*, 232 F.3d at 668.  A state prisoner does not fairly present a claim

22  to the state court if the court must read beyond the pleading filed in that court to discover the

23  federal claim.  *Baldwin*, 541 U.S. at 27.

24          Where a habeas petitioner has failed to "fairly present" his federal claims to the

25  state's highest available court in a procedurally appropriate manner, state court remedies

26  may, nonetheless, be "exhausted."  This type of exhaustion is often referred to as

27  "procedural default" or "procedural bar."  *Ylst v. Nunnemaker*, 501 U.S. 797, 802-05 (1991);

28  *Coleman*, 501 U.S. at 731-32. There are two categories of procedural default.

First, a state court may have applied a procedural bar, such as waiver or preclusion, when the prisoner attempted to raise the claim in state court. *Nunnemaker*, 501 U.S. at 802-05. Thus, a state prisoner may be barred from raising federal claims that he did not preserve in state court by making a contemporaneous objection at trial, on direct appeal, or when seeking post-conviction relief. *Bonin v. Calderon*, 59 F.3d 815, 842 (9th Cir. 1995) (stating that failure to raise contemporaneous objection to alleged violation of federal rights during state trial constitutes a procedural default of that issue.); *Thomas v. Lewis*, 945 F.2d 1119, 1121 (9th Cir. 1991) (finding claim procedurally defaulted where the Arizona Court of Appeals held that habeas petitioner had waived claims by failing to raise them on direct appeal or in first petition for post-conviction relief.) If the state court also addressed the merits of the underlying federal claim, the "alternative" ruling does not vitiate the independent state procedural bar. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Carringer v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (state supreme court found ineffective assistance of counsel claims "barred under state law," but also discussed and rejected the claims on the merits, en banc court held that the "on-the-merits" discussion was an "alternative ruling" and the claims were procedurally defaulted and barred from federal review). A higher court's subsequent summary denial of review affirms the lower court's application of a procedural bar. *Nunnemaker*, 501 U.S. at 803.

In the second procedural default scenario, where a state prisoner failed to present his federal claims in state court returning to state court would be "futile" because the state courts' procedural rules, such as waiver or preclusion, would bar consideration of the previously unraised claims. *Teague v. Lane*, 489 U.S. 288, 297-99 (1989); Ariz. R. Crim. P. 32.1, 32.2(a) & (b); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d 1035, 1048-53 (1996); Ariz. R. Crim. P. 32.1(a)(3) (relief is precluded for claims waived at trial, on appeal, or in any previous collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must be filed within thirty days of trial court's decision). A state post-conviction action is futile where it is time-barred. *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir. 1997) (recognizing

- 15 -

1  untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition

2  for post-conviction relief, distinct from preclusion under Rule 32.2(a)).  Arizona courts have

3  consistently applied their procedural default rules.  *Stewart v. Smith*, 536 U.S. 856, 860

4  (2002)(holding that Arizona Rule of Criminal Procedure 32.2(a) is an adequate and

5  independent procedural bar); *Ortiz v. Stewart*, 149 F.3d 923, 931-32 (9th Cir. 1998)

6  (rejecting the argument that Arizona courts have not "strictly or regularly followed" Rule

7  32); *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992)(rejecting the assertion that Arizona

8  courts' application of procedural default rules had been "unpredictable and irregular.").

9         In either case of procedural default, federal review of the claim is barred absent a

10  showing of "cause and prejudice" or a "fundamental miscarriage of justice."  *Dretke v.*

11  *Haley*, 541 U.S. 386, 393-94, (2004); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To

12  establish "cause," a petitioner must establish that some objective factor external to the

13  defense impeded his efforts to comply with the state's procedural rules.  *Id.*  The following

14  objective factors may constitute cause: (1) interference by state officials, (2) a showing that

15  the factual or legal basis for a claim was not reasonably available, or (3) constitutionally

16  ineffective assistance of counsel.  *Id.*  Ordinarily, the ineffective assistance of counsel in

17  collateral proceedings does not constitute cause because "the right to counsel does not

18  extend to state collateral proceedings or federal habeas proceedings." *Martinez-Villareal v.*

19  *Lewis*, 80 F.3d 1301, 1306 (9th Cir. 1996).  To establish prejudice, a prisoner must

20  demonstrate that the alleged constitutional violation "worked to his actual and substantial

21  disadvantage, infecting his entire trial with error of constitutional dimension." *United States*

22  *v. Frady*, 456 U.S. 152, 170 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1996).

23  Where petitioner fails to establish cause, the court need not reach the prejudice prong.

24         A federal court may also review the merits of a procedurally defaulted habeas

25  claim if the petitioner demonstrates that failure to consider the merits of his claim will result

26  in a "fundamental miscarriage of justice."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  A

27  "fundamental miscarriage of justice" occurs when a constitutional violation has probably

28  resulted in the conviction of one who is actually innocent.  *Id.*  To satisfy the "fundamental

1   miscarriage of justice" standard, petitioner must establish that it is more likely than not that

2   no reasonable juror would have found him guilty beyond a reasonable doubt in light of new

3   evidence. *Schlup*, 513 U.S. at 327; 28 U.S.C. § 2254(c)(2)(B). Even if petitioner asserts a

4   claim of actual innocence to excuse his procedural default of a federal claim, federal habeas

5   relief may not be granted absent a finding of an independent constitutional violation

6   occurring in the state criminal proceedings. *Dretke*, 541 U.S. at 393-94.

7                  **B. Application of Law to Petitioner's Claims**

8         Respondents assert that because Petitioner did not present claims 2b, 3, 4a, and 5

9   to the state courts in any of his state court proceedings, these claims are procedurally

10   defaulted and barred from federal review. Specifically, Respondents claim that Petitioner

11   never presented the following claims to the state courts: (1) that counsel was ineffective in

12   advising him that the court would impose concurrent prison terms of 15 years or less if

13   Petitioner pled guilty (Claim 2b); (2) the imposition of consecutive sentences on Counts 1

14   and 2 violated the Double Jeopardy Clause of the Fifth Amendment (Claim 3); (3) the trial

15   court violated the Fifth Amendment's grand jury clause (Claim 4a); and (4) the Arizona

16   Court of Appeals was biased against Petitioner (Claim 5).

17              **1. Claims Presented in Rule 32 Of-Right Proceedings**

18         In his Rule 32 of-right proceedings, including the petition for review to the

19   Arizona Court of Appeals in 1 CA-CR-04-0077-PRPC, Petitioner alleges the following two

20   claims: (1) the trial court's imposition of consecutive sentences for Count 1 (attempted first-

21   degree murder) and  Count 2 (first-degree burglary) violated A.R.S. § 13-116; and (2)

22   Petitioner's first attorney, Kenneth Huls, rendered ineffective assistance by failing to timely

23   convey a plea offer to Petitioner. (Respondents' Exhs. O at 2-8, Q at 2-4, R at 5-12)

24         Petitioner's Rule 32 of-right proceedings did not include any of the federal issues

25   raised in Claims 2b, 3, 4a, and 5 of the pending Amended Petition for Writ of Habeas

26   Corpus.

27

28

**2. Supplemental Petition for Post-Conviction Relief under Rule 32**

Similarly, Petitioner's supplemental Rule-32 petition did not include any of the issues raised in Claims 2b, 3, 4a, and 5 of the pending Amended Petition for Writ of Habeas Corpus.  (Respondents' Exh. W; docket # 9) Rather, in his supplemental Rule-32 petition, Petitioner raised three *Blakely*-related issues: (1) his sentence was improperly aggravated based on facts not found by a jury; (2) his plea was involuntary because counsel did not advise him of his right to have a jury find aggravating factors beyond a reasonable doubt; and (3) counsel was ineffective for not demanding a jury trial on aggravating factors. (Respondents' Exh. W at 1-2)

Although Petitioner's petition for review to the Arizona Supreme Court in 1 CA-CR-04-1051-PRPC challenged the merits of the Arizona Court of Appeals' decision which reversed the trial court's grant of post-conviction relief on *Blakely* grounds, Petitioner did not assert that the Arizona Court of Appeals was biased against him.  (Respondents' Exh. GG)

**C. Summary of Procedurally Defaulted Claims**

The record reveals that Petitioner never presented to the Arizona courts the federal issues raised in Claims 2b, 3, 4a, and 5 of the pending Amended Petition for Writ of Habeas Corpus.

In Claim 2b, Petitioner alleges that his subsequent defense counsel incorrectly advised him regarding the length of his sentence.  Petitioner never presented this claim of ineffective assistance to the state courts.  Although Petitioner exhausted a claim of ineffective assistance of counsel based on the failure of his first attorney, Kenneth Huls, to communicate a plea offer (Claim 2a), fair presentation of one ground of ineffective assistance of counsel does not exhaust other issues related to counsel's assistance. *Beaty v. Stewart*, 303 F.3d 975, 989-90 (9th Cir. 2002).

In Claim 3, Petitioner asserts a double jeopardy violation based on the imposition of consecutive sentences.  Although Petitioner presented the factual basis of this claim to the state courts in the context of a challenge to his sentence based on Arizona law, A.R.S. § 13-

116, presentation of a state law claim is not sufficient to exhaust a federal claim. Rather, the exhaustion doctrine requires a state prisoner to present a claim to the state courts based on the same legal theory upon which he relies in federal court. *Hiivala*, 195 F.3d at 1106 ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion."); *Reese*, 541 U.S. at 28 (stating that a reference to ineffective assistance does not alert the state court to the federal nature of the claim).

The state courts should be afforded the first opportunity to consider a state prisoner's claim that his conviction and/or sentence violates his federal rights. *Williams*, 529 U.S. at 436-37. Accordingly, a federal court cannot grant habeas relief based on claims that were never presented to the state courts. *Noltie v. Peterson*, 9 F.3d 802, 804 (9th Cir. 1993). Claims 2b, 3, 4a, and 5 are procedurally defaulted because Arizona's procedural rules prohibit Petitioner, who has already filed two petitions for post-conviction relief, to raise his claims in a subsequent Rule 32 petition. Ariz.R.Crim.P. 32.2(a)(3)(precluding post-conviction relief upon any ground "that has been waived at trial on appeal, or in any previous collateral proceeding."); *Mata*, 185 Ariz. at 332, 916 P.2d at 1048 (defendant waived his claim that defendant's counsel was ineffective where defendant did not raise that claim in first or second petition for post-conviction relief.) Because Petitioner did not properly present claims 2b, 3, 4a, and 5 to the Arizona courts, these claims are procedurally barred. Accordingly, the Court need not reach the merits of these claims unless Petitioner either establishes "cause and prejudice" or a "fundamental miscarriage of justice."

**D. "Cause and Prejudice" or "Fundamental Miscarriage of Justice"**

As discussed below, Petitioner does not establish a basis to overcome the procedural default of Claims 2b, 3, 4a, and 5.

Proof of cause "ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded" his compliance with the state rule. *Id.* at 72. Petitioner argues that his lack of legal knowledge excuses the procedural bar. Petitioner's *pro se* status and ignorance of the law do not satisfy the cause standard. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986). Petitioner also asserts

1   that he did not have access to the court transcripts until after the Court of Appeals denied

2   review of his petition for post-conviction relief.  Petitioner states that he received the

3   transcripts during the "*pro per*" stage of his appeal.   Accordingly, Petitioner received the

4   transcripts while the state proceedings were still ongoing.  Petitioner, however, does not

5   explain why he failed to raise his defaulted claims after he received the transcripts or why he

6   was unable to raise his claims before he received the transcripts.  *Jihad v. Hvass*, 267 F.3d

7   803, 806-07 (8th Cir. 2001) (stating that lack of access to transcript did not preclude filing of

8   petition of post-conviction relief.)  Where petitioner fails to establish cause for his

9   procedural default, the court need not consider whether petitioner has shown actual

10  prejudice resulting from the alleged constitutional violations. *Smith v. Murray*, 477 U.S. 527,

11  533 (1986).  Therefore, Petitioner has failed to carry his burden of proof regarding cause and

12  prejudice.

13          Petitioner also fails to establish that failure to consider his claims would result in

14  a fundamental miscarriage of justice.  *Schlup*, 513 U.S. at 327.  Accordingly, Petitioner's

15  claims 2(b), 3, 4(a), and 5 are procedurally defaulted and barred from review.[2]

16

17

18

_____

19          [2] Even if claim 4(a) was properly before this Court, it would fail on the merits.  The Fifth

20  Amendment's grand jury clause has not been incorporated by the Fourteenth Amendment's Due
    Process clause and, therefore, does not apply to the states. *Hurtado v. People of California*, 110

21  U.S. 516, 534-35 (1884)("Indictment by grand jury is not part of the due process guarantees of
    the Fourteenth Amendment that apply to state criminal defendants."); *Jeffries v. Blodgett*, 5 F.3d

22  1180, 1188 (9th Cir. 1993).  Accordingly, a state prisoner is not entitled to federal habeas relief

23  based upon the allegedly improper amendment of a charge on which he has been indicted.
    *Lanfranco v. Murray*, 313 F.3d 112, 118-19 (2nd Cir. 2002).

24

25          Similarly, even if Petitioner's claim 5, appellate-court bias, was properly before this
    court, it would fail on the merits.  Petitioner's assertion that the Arizona Court of Appeals was

26  biased against him is based solely on the appellate court's order reversing the trial court's

27  *Blakely* ruling.   A court's adverse rulings alone almost never support a claim for bias or
    impartiality. *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *Poland v. Stewart*, 117

28  F.3d 1094, 1103 (9th Cir. 1996).

**III.  Analysis of Claims 1, 2a, and 4b**

     After discussing the standard of review, the Court will consider the merits of Petitioner's claims 1, 2a, and 4b which are properly before the Court.

     **A. Standard of Review**

     In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

     Under the AEDPA, a state prisoner "whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price v. Vincent*, 538 U.S. 634, 638 (2003).  Thus, a state prisoner is not entitled to relief unless he demonstrates that the state court's adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2); *Carey v. Musladin*, ___ U.S. ___, 127 S.Ct. 649, 653 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006).  To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts must look exclusively to the holdings of the Supreme Court which existed at the time of the state court's decision.  *Mitchell v. Esparza*, 540 U.S. 12, 15-15 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

     Accordingly, the Ninth Circuit has acknowledged that it cannot reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal constitutional issue.  *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Even if the state court neither explained its ruling nor cites United States Supreme Court authority, the reviewing federal court must

1    nevertheless examine Supreme Court precedent to determine whether the state court

2    reasonably applied federal law.  *Early v. Packer*, 537 U.S. 3, 8 (2003).  The United States

3    Supreme Court has expressly held that citation to federal law is not required and that

4    compliance with the habeas statute "does not even require awareness of our cases, so long as

5    neither the reasoning nor the result of the state-court decision contradicts them." *Id*.

6            A state court's decision is "contrary to" federal law if it applies a rule of law

7    "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set

8    of facts that are materially indistinguishable from a decision of [the Supreme Court] and

9    nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*

10   *Esparza*, 540 U.S 12, 14 (2003)(citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411

11   (2000).

12           A state court decision involves an "unreasonable application of" federal law if

13   the court identifies the correct legal rule, but unreasonably applies the rule to the facts of a

14   particular case.  *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005).   An

15   incorrect application of state law does not satisfy this standard.  *Yarborough v. Alvarado*,

16   541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the

17   state court's decision is objectively unreasonable.")  "It is not enough that a federal habeas

18   court, in its independent review of the legal question," is left with the "firm conviction" that

19   the state court ruling was "erroneous." *Id*.; *Andrade*, 538 U.S. at 75.  Rather, the petitioner

20   must establish that the state court decision is "objectively unreasonable." *Middleton v.*

21   *McNeil*, 541 U.S. 433 (2004); *Andrade*, 538 U.S. at 76.

22           Where a state court decision is deemed to be "contrary to" or an "unreasonable

23   application of" clearly established federal law, the reviewing court must next determine

24   whether it resulted in constitutional error.  *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th

25   Cir. 2002).  Habeas relief is warranted only if the constitutional error at issue had a

26   "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v.*

27   *Abrahamson*, 507 U.S. 619, 631 (1993).  In § 2254 proceedings, the federal court must

28   assess the prejudicial impact of a constitutional error in a state-court criminal proceeding

1    under *Brecht's* more forgiving "substantial and injurious effect" standard, whether or not the

2    state appellate court recognized the error and reviewed it for harmlessness under the

3    "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S.

4    18, 24 (1967).  *Fry v. Pliler*, ___ U.S.___, 127 S.Ct. 2321, 2328 (2007).  The *Brecht*

5    harmless error analysis also applies to habeas review of a sentencing error.  The test is

6    whether such error had a "substantial and injurious effect" on the sentence.  *Calderon v.*

7    *Coleman*, 525 U.S. 141, 145-57 (1998) (holding that for habeas relief to be granted based on

8    constitutional error in capital penalty phase, error must have had substantial and injurious

9    effect on the jury's verdict in the penalty phase.); *Hernandez v. LaMarque*, 2006 WL

10   2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if the evidence of three of petitioner's

11   prior convictions was insufficient, petitioner was not prejudiced by the court's consideration

12   of those convictions because the trial court found four other prior convictions which would

13   have supported petitioner's sentence.)  The Court will review Petitioner's claims under the

14   applicable standard of review.

15              **B.  Claim 1 - Aggravated Sentences**

16              In his first ground for relief, Petitioner claims that the aggravated sentences

17   imposed for his attempted first-degree murder and first-degree burglary convictions violate

18   the Sixth Amendment's jury trial guarantee because the judge, not a jury, found the

19   aggravating factors that increased his sentences above the presumptive 10.5 year term that

20   applied to such class 2 dangerous felonies under Arizona law.

21              Petitioner raised this same federal claim in state court.  The Arizona Court of

22   Appeals ultimately affirmed Petitioner's aggravated sentences because Petitioner failed to

23   timely object to judicial fact-finding at sentencing.  The appellate court further found that

24   Petitioner did not prove that any sentencing error was both fundamental and prejudicial.

25   (Respondents' Exh. FF) The appellate court explained that (1) in accordance with the

26   Arizona Supreme Court's holding in *Martinez*, once the trial court finds one sentencing

27   factor compliant with *Blakely,* it may consider other aggravating factors to impose a

28   sentence within the enhanced sentencing range; (2) any *Blakely* violation with respect to

1    Petitioner's sentence for the attempted first-degree murder conviction (Count 1) was non-

2    prejudicial error because no reasonable juror could have failed to find at least one cited

3    aggravating circumstance - Petitioner's "lying in wait for Sara"; and (3) any *Blakely*

4    violation with respect to the first-degree burglary conviction (Count 2) was non-prejudicial

5    error because no reasonable juror could have failed to find at least one cited aggravating

6    circumstance - Petitioner "engaged in extensive planning and preplanning." (Respondents'

7    Exh. FF at 12-13)

8         Petitioner has not established that the state court's decision is either "contrary to"

9    or involves an "unreasonable application of" clearly established federal law that existed at

10   the time of the state court's decision.  28 U.S.C. § 2254(d).

11        The Arizona Court of Appeals correctly determined that any Sixth Amendment

12   violation in this case was not structural error which would have required re-sentencing.

13   Federal courts apply the plain-error standard to review Sixth Amendment violations to

14   which defendant failed to object at sentencing.  *United States v. Cotton*, 535 U.S. 625, 631

15   (2002)(declining to reverse sentence based on *Apprendi*-error under the fourth requirement

16   of the plain error standard).  On habeas corpus review, the controlling standard of review is

17   less stringent than on direct review and inquires "whether the error 'had substantial and

18   injurious effect or influence,'" and whether the error resulted in "actual prejudice." *Fry*,

19   __U.S.__, 127 S.Ct. at 2328,  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (quoting

20   *Kotteakos v. United States*, 328 U.S. 750, 766 (1946) and *United States v. Lane*, 474 U.S.

21   438, 449 (1986), respectively).

22        In this case, because Petitioner did not object at trial to the failure to have a jury

23   determine the aggravated factors, any *Blakely* violation was properly reviewed for

24   fundamental error,[3] rather than for harmless error.  *Nino v. Flannagan*, 2007 WL 1412493, *

25   _____

26        [3] Fundamental error is "error going to the foundation of the case, error that takes from
27   the defendant a right essential to his defense, and error of such magnitude that the defendant
     could not have possibly received a fair trial."  *State v. Henderson*, 210 Ariz. 561, 568, 115 P.3d
28   601, 608 (Ariz. 2005)(citation omitted).  Under the analogous federal plain-error standard, an

3 n. 3 (citing *State v. Henderson*, 210 Ariz. 561, 115 P.3d 601, 608 (Ariz. 2005)).  The

appellate court denied relief because Petitioner did not prove "both that fundamental error

exists and that the error in this case caused him prejudice." (Respondents' Exh. FF) (citing

*Henderson*, 210 Ariz. at 568, 115 P.3d at 608.)  The Arizona Court of Appeals' application

of the fundamental-error standard to review the unobjected-to sentencing error was neither

contrary to, nor an unreasonable application of Supreme Court precedent because Arizona's

fundamental error standard is functionally equivalent to the plain-error standard that federal

appellate courts apply when reviewing Sixth Amendment violations to which the defendant

did not raise a timely objection.

        In this case, the Arizona Court of Appeals found that Petitioner failed to prove

prejudice with respect to his aggravated sentences:

> As to count one, the attempted first-degree count, one of the aggravators upon which the trial court relied was that Mullins was lying in wait for Sara.  On the record before us, it is clear that Mullins cannot meet his burden of showing prejudice.  The trial court expressly found that defendant "acknowledged his agreement to the narrative factual basis."  In that narrative, defendant acknowledged that he arrived at the victim's home at 6:00 a.m.  He watched the parties leave the home and then entered through the back of the home.  After taking other steps to prepare for his crimes, Mullins waited for Sara to come home.  As Mullins stated in his videotaped confession, he hid when he heard Sara enter the home.  After Sara changed into her undergarments and exited the bathroom, Mullins, masked and gloved, attacked her.  From Mullins' statements, it was clear that he prepared and waited in hiding at the home for at least 4 hours prior to committing the crimes.  Mullins has shown no prejudice from any *Blakely* error; no reasonable juror could concluded that Mullins did not lay in wait to attack Sara.  *See Henderson*, 210 Ariz. ___, ¶ 27, 115 P.3d at 609.
>
> As to count two, first-degree burglary, the trial court found as an aggravator that Mullins "engaged in extensive planning and preplanning."  As with the aggravator referenced above, no reasonable jury could have concluded otherwise.  As the trial court noted, Mullins "equipped [himself] with gloves so as to not leave fingerprints which was [confirmed] by [Mullins'] statement to the police. [Mullins] used two types of masks, a nylon [mask] and a ski mask."  In the narrative statement set forth by counsel, Mullins agreed that before entering the house he "had put on surgical gloves which he had procured in Idaho.  He also brought with him a backpack [which] contained

_____

appellate court cannot reverse, based upon an objection not timely raises in the lower court unless: (1) there was error, (2) the error was "plain," (3) the error "affects substantial rights"; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Cotton*, 535 U.S. at 632(citations omitted).

1    [a] ski mask . . . pantyhose, mask, nylon cord and duct tape."

2 (Respondents' Exh. FF at 12-13)

3    The record, including the testimony of the State's witnesses at the sentencing

4 hearing, Petitioner's statements at the change-of-plea hearing, and Petitioner's two post-

5 arrest statements, supports the state court's finding that Petitioner was not prejudiced as the

6 result of any error in the sentencing procedures.

7    The Arizona court's application of *Blakely* is neither contrary to, nor an

8 unreasonable application of, Supreme Court precedent.  Under *Blakely*, the Sixth

9 Amendment requires that a jury determine beyond a reasonable doubt, or a defendant admit,

10 any fact (other than a prior conviction) which is "legally essential to punishment."  *Blakely*,

11 542 U.S. at 313.  Under the applicable Arizona sentencing scheme, if one or more

12 aggravating factors is found, the court may impose an aggravated sentence.  *State v.*

13 *Williams*, 131 Ariz. 411, 412-13, 641 P.2d 899, 900-01 (App. 1981) (stating that Arizona

14 trial courts are "not authorized to impose sentences beyond the presumptive terms without

15 making findings of aggravating circumstances and giving reasons in support of those

16 findings.")

17    Under this sentencing scheme, once a single *Blakely*-compliant aggravating

18 factor is found, a defendant is exposed to the fully aggravated sentencing range and the trial

19 court may consider additional factors relevant to the imposition of a sentence within the

20 statutory sentencing range.  A.R.S. § 13-702(B).  This procedure comports with

21 *Apprendi/Blakey* jurisprudence because the Supreme Court has reaffirmed that trial judges

22 may consider any relevant evidence in determining the appropriate sentence within the

23 applicable statutory range. *Harris v. United States*, 536 U.S. 545, 549 (2002) (stating that

24 "[a]fter the accused is convicted, the judge may impose a sentence within a range provided

25 by statute, basing it on various facts relating to the defendant and the manner in which the

26 offense was committed.  Though these facts may have a substantial impact on the sentence,

27 they are not elements, and are thus not subject to the Constitution's indictment, jury, and

28 proof requirements."); *Apprendi*, 530 U.S. at 481 (explaining that "[w]e should be clear that

1   nothing in [the history of the right to a jury trial] suggests that it is impermissible for judges

2   to exercise discretion - taking into consideration various factors relating both to the offense

3   and offender - in imposing a judgment within the range prescribed by statute.  We have

4   often noted that judges in this country have long exercised discretion of this nature in

5   imposing sentences within the statutory limits in individual cases.")

6          Courts within the Ninth Circuit have held that the existence of one *Blakely*-

7   complaint factor, such as a prior conviction or facts admitted by defendant, is sufficient

8   support for the imposition of "a sentence anywhere within the statutory range." *Jones v.*

9   *Schriro*, No. CV-05-3720-PHX-JAT (DKD), 2006 WL 1794765, * 3 (D.Ariz., June 27,

10  2006).  In *Jones*, the court noted that "once a jury finds or a defendant admits a single

11  aggravating factor, the Sixth Amendment permits the sentencing judge to find and consider

12  additional factors relevant to the imposition of a sentence up to the maximum prescribed in

13  that statute.'" *Id.* at * 2 (quoting *State v. Martinez*, 210 Ariz. 578, 585, 115 P.2d 618 (2005)).

14  Petitioner in *Jones* admitted either in the written plea agreement, at the change of plea

15  hearing, or at sentencing to critical facts underlying the finding of three different aggravating

16  factors.  *Id.*  The *Jones* court found that petitioner's admission of any one of those

17  aggravating factors satisfied *Blakely* and authorized the trial court to impose a sentence

18  anywhere within the statutory range.  *Id.* at * 3.

19          In *Garcia v. Schriro*, No. 06-855-PHX-DGC (DKD), 2006 WL 3292473

20  (D.Ariz., Nov. 9, 2006), the district court held that petitioner's aggravated sentence did not

21  violate *Blakely*.  The court found that Petitioner's admission of pecuniary gain in the plea

22  agreement was sufficient to establish an aggravating factor in accordance with *Blakely*.  *Id.*

23  at * 3.  The court also found that the trial court properly considered petitioner's prior

24  convictions even though the plea agreement provided that the state withdrew the allegations

25  of prior convictions. *Garcia*, 2006 WL 3292473, * 2.  The court noted that the prior

26  convictions were not alleged for enhancement purposes and that the court learned of the

27  prior convictions from a probation officer's presentence investigation report and from

28  petitioner's counsel.  *Id.*

Similarly, in *Nino v. Flannigan*, No. 2:04cv2298-JWS (CRP), 2007 WL 1412493 (D.Ariz., May 14, 2007), the district court found that petitioner's aggravated sentence comported with *Blakely* where one of the aggravating factors, a prior conviction, was *Blakely*-exempt, and petitioner admitted the other aggravating factor during the plea colloquy. *Id.* at * 4. The court explained that under A.R.S. § 13-702, the existence of a single aggravating factor exposes a defendant to an aggravated sentence. *Id.* In *Nino*, the trial judge considered two aggravating circumstances, "the criminal history beyond the alleged and proven and the struggle with the officers."*Id.* The court noted that *Blakely* does not require the fact of a prior conviction be presented to and found by a jury beyond a reasonable doubt. *Id.* (citing *Blakely*, 542 U.S. 296) The *Nino* court found that "[o]f the two factors considered by the sentencing judge in aggravating Petitioner's sentence . . . one was Blakely-exempt and the other was admitted by Petitioner. Therefore, there was no Blakely error in connection with the sentencing." 2007 WL 1412493, at * 4.

In this case, Petitioner pled guilty to attempted first-degree murder (Count 1) and armed burglary (Count 2), both of which were class 2 felonies and dangerous crimes on that date of commission, February 12, 2000. (Respondents' Exh. A; A.R.S. §§ 13-604, 13-1001, 13-1105, 13-1508). Under the applicable Arizona law, such class 2 dangerous felonies yield a presumptive term of 10.5 years imprisonment. A.R.S. § 13-604(I)(2000). Arizona law further provides that the "presumptive term may be mitigated or aggravated within the range prescribed under this subsection pursuant to the terms of section 13-702 subsections B, C, and D." A.R.S. § 13-604(I)(2000). Thus, the court could impose a minimum sentence of 7 years or a maximum sentence of 21 years. *Id.*

During the plea hearing, Petitioner acknowledged his agreement to the narrative factual basis for his convictions for attempted first degree murder and first degree burglary. (Respondents' Exh. FF at 12-13; D at 15-20) Specifically, Petitioner acknowledged that he waited outside the victim's home for the family to leave for the day and that he waited inside the house, without permission, for at least four hours for Sara to come home from school. He hid when he heard Sara enter the house and, wearing a mask and gloves, attacked Sara.

1   *Id.* Petitioner's acknowledgment of the foregoing facts established that Petitioner had laid in

2   wait to attack Sara and was sufficient to expose Petitioner to the fully aggravated term on the

3   attempted first-degree murder conviction. *Blakely*, 542 U.S. at 303-04; *Jones*, 2006 WL

4   1794765, * 3 (once defendant admitted any aggravating factor, the trial court was authorized

5   to consider other aggravating factors and impose a sentence anywhere within the enhanced

6   range.)

7           Similarly, Petitioner acknowledged the factual basis for the first-degree burglary

8   conviction.  He admitted that he wore gloves, which he had obtained in Idaho, to avoid

9   leaving fingerprints, that he wore a ski mask and a pantyhose mask.  (Respondents' Exh. FF

10  at 12-13; D at 15-20) He further acknowledged that he brought with him a back pack which

11  contained nylon cord, duct tape, and the two masks.  *Id.* Petitioner's acknowledgment of

12  these facts supported a finding that he had engaged in "extensive planning and preplanning"

13  sufficient to expose Petitioner to the fully aggravated sentence for first-degree burglary.

14          In other words, without any additional findings, Petitioner's acknowledgment of

15  the factual basis underlying his convictions expanded the sentencing range to include a fully

16  aggravated sentence.  *Jones*, 2006 WL 1794765, * 3; *Nino*, 2007 WL 1412493, * 4.  Thus,

17  Petitioner's aggravated sentences comport with the Sixth Amendment.

18          Based on the foregoing, the state court's finding that the sentencing procedure in

19  Petitioner's trial did not warrant a new trial on the aggravated factors is neither contrary to,

20  nor an unreasonable application of the Supreme Court's *Apprendi*/*Blakely* jurisprudence.

21  Contrary to Petitioner's assertion, the trial court properly considered the aggravating factors

22  which were based on Petitioner's acknowledgment during the change of plea hearing.  Once

23  the new maximum was established, the trial court was authorized to sentence Petitioner

24  anywhere within the new maximum sentencing range. *Jones*, 2006 WL 1794765, * 3;

25  *Stokes*, 465 F.3d 397, * 2-3; *Garcia*, 2006 WL 3292473, * 2.  Because Petitioner's sentences

26  comported with the Sixth Amendment as analyzed in *Blakely*, Petitioner is not entitled to

27  habeas corpus relief.   Moreover, even if *Blakely* error occurred, such a violation did not

28  have a "substantial and injurious effect" on Petitioner's sentence.  *Calderon*, 525 U.S. at

145-47.  Based on the record, no jury would fail to find the aggravating factors - that Petitioner had laid in wait and engaged in extensive pre-planning - had they been asked to do so and, therefore, any error is harmless.  *Id.* (see, *supra* pp. 24-25)

### *Cunninghman v. California*, ___ **U.S.___, 127 S.Ct. 856, 871 (Jan. 22, 2007)**

As previously mentioned, after briefing closed in this matter, the Supreme Court issued *Cunnigham v. California*, ___U.S.___, 127 S.Ct. 856, 871 (Jan. 22, 2007) which invalidated California's determinate sentencing law ("DSL") under the Court's *Apprendi/Blakely* jurisprudence.  In an abundance of caution, the Court directed the parties to submit supplemental briefing discussing the application of *Cunningham* to this case.  As discussed below, *Cunningham* does not change the conclusion that Petitioner is not entitled to habeas corpus relief.

Even if *Cunningham* governed Arizona's sentencing scheme as it existed when Petitioner was sentenced, the AEDPA requires that this Court limit its review to clearly established federal law that existed at the time of the Arizona Court of Appeals' decision at issue in this case. *Williams v. Taylor*, 529 U.S. 362 (2000)(explaining that "clearly established federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.")  As the Second Circuit noted in rejecting a Sixth Amendment challenge to judicial findings in a non-capital case:

> Later Supreme Court decisions play no role in assessing the reasonableness of the state court decisions (footnote omitted).  Accordingly, our appraisal of reasonableness of the state court interpretations of *Apprendi* may not be influenced by the Supreme Court's subsequent elucidation in such cases as *Blakely v. Washington*, [542 U.S. 296 (2004)] and *United States v. Booker*, [543 U.S. 220 (2004)].  We conclude that the state courts did not unreasonably apply *Apprendi* and the cases that preceded it, as understood at the time, and therefore, that Petitioners are not entitled to habeas relief.

*Brown v. Greiner*, 409 F.3d 523, 533-34 (2nd Cir. 2005); *Allen v. Reed*, 427 F.3d 767, 774 (10th 2005).

In this case, the last non-capital Sixth Amendment case available at the time of the Arizona Court of Appeals' decision was *Blakely*. This Court has already stated that it cannot find that the state court's rejection of Petitioner's Sixth Amendment/*Blakely* claim is either contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court at the time of the state court's decision. 28 U.S.C. §2254(d).

**C. Claim 2a**

In Claim 2a, Petitioner contends that his first lawyer, Kenneth Huls, rendered ineffective assistance by failing to convey a plea offer to Petitioner before it expired. Petitioner raised this claim in his Rule 32 of-right proceeding. The trial court rejected this claim based on the following exchange between the prosecutor and the Court at the change of plea hearing:

> Ms. Gallagher: I want the record to be clear. I have had this problem in the past, that in this case there was a plea agreement made some time ago to the Defendant by a different prosecutor. The Defendant turned down the plea. He got new counsel. They asked for the plea back. By then the case was assigned to me. While Mr. Hanson asked me for it back, I refused. There is no plea. There will never be a plea in this case. Just so the record is clear, that Mr. Hanson did in fact, ask, Mr. Mullins had already turned it down and, I am not going to give it back.

> The Court: All right. You took over the case as the subsequent prosecutor, correct?

> Ms. Gallagher: Yes, your honor.

> The Court: Did you, Mr. Hanson, take over the case as defense counsel from someone else or have you been the defense attorney throughout?

> Mr. Hanson: I am also subsequent defense counsel.

> The Court: Was it a different prosecutor and different defense attorney when the prior plea offer was made?

> Ms. Gallagher: Yes, your honor.

> The Court: Okay. Do you understand that, Mr. Mullins?

> The Defendant: Yes.

> The Court: Ms. Gallagher says when you were previously represented by a different defense attorney you had been presented an offer by the State and after receiving advice from your prior defense attorney, you chose to

reject that plea offer; is that correct?

The Defendant: Yes, that's correct.

The Court: Ultimately, the decision to accept or reject the plea offer rests with you, the Defendant; do you understand that?

The Defendant: Yes.

The Court: [Is that w]hat you did?

The Defendant: Yes.

(Respondents' Exh. D at 14-15) Based on this information regarding the rejection of the plea offer, the court rejected Petitioner's claim of ineffective assistance of counsel concluding that:

> In contradiction to his acknowledgment in court that his prior attorney had presented the State's plea offer to him, advised him regarding the plea offer, and that had chosen to reject it [reporter's transcript of 10/17/2000, at Pages 14-15], Defendant now claims in his affidavit that it was his attorney and not he who rejected the plea offer. Noticeably absent is any affidavit by his former counsel, Ken Huls. The Defendant's affidavit is contradicted by his statement in court. He has presented no objective evidence to support a colorable claim of ineffective assistance.

(Respondents' Exh. Q at 4)

The record reflects that Petitioner presented two contradictory statements to the court on post-conviction review: (1) his statements made during the change of plea hearing acknowledging that prior counsel, Ken Huls, had presented him with the State's plea offer, and that Petitioner had rejected that offer after consulting with counsel; and (2) his assertions during post-conviction proceedings Ken Huls rejected the State's plea offer without communicating it to Petitioner.  The trial court found Petitioner's earlier sworn statements made during the change-of-plea hearing more credible than his later assertions made during post-conviction proceedings.

On  habeas corpus review, a state court's factual determinations are presumed correct and petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This Court, therefore, defers to the trial judge who personally observed Petitioner's demeanor during the change-of-plea hearing when

1    Petitioner advised the Court that he had reviewed the State's plea offer with his former

2    defense counsel and had rejected it.  "Section 2254(d) 'gives federal habeas courts no

3    license to redetermine credibility of witnesses whose demeanor has been observed by the

4    state trial court.'" *Aiken v. Blodgett*, 921 F.2d 214, 217 (9th Cir. 1990) (quoting *Marshall v.*

5    *Lonberger*, 459 U.S. 422, 434 (1983)).

6            Additionally, the trial court properly assigned more weight to Petitioner's

7    change-of-plea statements than to his post-conviction assertions.  The Supreme Court has

8    noted that "[t]he representations of the defendant, his lawyer, and the prosecutor at [the

9    change-of-plea] hearing, as well as any findings made by the judge accepting the plea,

10   constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v.*

11   *Allison*, 431 U.S. 63, 73-74 (1977).  Furthermore, a defendant's "solemn declarations in

12   open court carry a strong presumption of verity." *Id.* at 74.  The Ninth Circuit has relied on

13   this principle to uphold a defendant's guilty plea against a challenge based on a defendant's

14   post-sentencing disavowal of statements that he made to the trial court regarding the

15   voluntariness of his plea. *Sanchez v. United States*, 50 F.3d 1448, 1455 (9th Cir. 1995)

16   (stating that "[f]irst, during the plea colloquy, [defendant] specifically denied that any threats

17   and coercions had been used against him.  Courts generally consider such responses to be

18   strong indicators of the voluntariness of the defendant's plea."); *Agtas v. Whitley*, 836 F.2d

19   1233, 1235 (9th Cir. 1988) (rejecting defendant's post-conviction claim he was impaired,

20   based upon avowal in court during the change of plea hearing that he had not taken any

21   drugs before the hearing); *Shah v. United States*, 878 F.2d 1156, 1160 (9th Cir. 1989) ("Here,

22   similarly, the district judge based his decision on a record which included transcripts of the

23   plea and sentencing hearings, the judge's own recollections of the proceedings, Shah's Rule

24   35 motion, and a letter Shah wrote to the judge.  In light of this record, the district court was

25   adequately apprised of the relevant facts in order to conclude that it was impossible to

26   believe Shah's claim that he did not know that the court would consider his prior record at

27   sentencing.").

28

1    In view of the foregoing, this Court defers to the state court's factual findings

2    which support the state court's conclusion that trial counsel did not render ineffective

3    assistance in failing to communicate a plea offer to Petitioner. *Williams*, 529 U.S. at 406.

4    Specifically, based on the State court's factual findings, counsel Ken Huls did convey the

5    State's plea offer to Petitioner and Petitioner chose to reject the offer.  Because the record

6    supports the finding that counsel conveyed the plea offer to Petitioner, a claim of ineffective

7    assistance premised upon counsel's failure to communicate the plea offer to Petitioner

8    cannot prevail.

9    **D. First-Degree Burglary Charge**

10    In Claim 4(d), Petitioner argues that the trial court improperly permitted

11    amendment of the first-degree burglary charge in violation of the Sixth Amendment's right

12    to notice when it ruled that Petitioner's sentences for Counts 1 and 2 could run consecutively

13    without violating A.R.S. § 13-116.  Petitioner properly exhausted this federal claim in the

14    state courts.  (Respondents' Exh. P at 3; Exh. R at 10)

15    Petitioner argues that the trial court permitted the State to amend the first-degree

16    burglary charge after the change-of-plea hearing by arguing that consecutive sentences were

17    permissible because Petitioner had unlawfully remained inside the Capp's home, armed with

18    a hammer and knife, with the intention of using these weapons against Sara's parents if they

19    returned home unexpectedly.  Petitioner claims that he only intended to murder Sara and that

20    he did not intend to commit first-degree burglary.  In support of this assertion, Petitioner

21    claims that the factual basis for the first-degree burglary charge that was articulated by

22    defense counsel and the prosecutor during the change-of-plea hearing did not affirmatively

23    assert that Petitioner had armed himself with the intention of committing an aggravated

24    assault against Sara's parents.  Petitioner's claim lacks merit.

25    Arizona law did not limit the trial court's consecutive-sentence determination to

26    consideration of statements made during the change of plea hearing in support of the first-

27    degree burglary charge.  Rather, under Arizona law "evidence of guilt may be derived from

28    any part of the record including presentence reports, preliminary hearing transcripts, or

admissions by the defendant . . . . the court of appeals has relied on police reports . . . and the statements of prosecutors . . . to establish factual bases."  *State v. Salinas*, 181 Ariz. 104, 106, 887 P.2d 985, 987 (Ariz. 1994)(citations omitted).

In this case, the grand jury transcript, the pre-sentence report, and the videotape of Petitioner's post-arrest statements that the judge viewed during the sentencing hearing establish that the first-degree burglary charge was based upon Petitioner's intention, not only to kill Sara inside the residence, but also to commit aggravated assault against her parents with the hammer and the knife that he obtained after entering the residence.  During the grand jury proceedings, Detective Wheeler gave the following testimony regarding Petitioner's post-arrest interview statements, which establishes his intent to assault Sara's parents:

> Q: Did he indicate why he took the knife out of the kitchen and put it in his pocket?
>
> A: Not at the time, but what he tells me is that he goes back upstairs.  He thinks he watches Price is Right, names off a couple of other shows, gets bored again so he walks downstairs and goes into the garage.
>
> Once he's in the garage, he takes a hammer from the wall that's displayed on the wall.  He takes the hammer and took it upstairs and hid it in the guest room in a dresser drawer and that's when I asked him, "Well, why did you get the knife and the hammer?"  And he tells me that in case somebody comes home, he's going to use those items on the person that shows up.  And that's when I asked him, "Well, were you going to use those on Sara?"  He goes, "No, I was just going to snap her neck."

(Respondents' Exh. B at 19-20)

During the pre-sentence aggravation/mitigation hearing, the trial court heard a recording of Petitioner's post-arrest statement wherein Petitioner told police that he picked up a hammer and knife inside the Capp's residence "just in case one of the parents came home" unexpectedly.  (Respondents' Exh. L at 18) He stated that "I didn't plan on using them on [Sara]."  (*Id.*)  Likewise, the presentence report states that Petitioner obtained a knife and hammer from the Capp's residence.  (Respondents' Exh. F at 1) It further states that "[Petitioner] took the hammer upstairs and hid it in a dresser drawer in the guest room. He said the knife and hammer were not to be used on the victim, but that those would be

1  used on her parents in the event they came home while he was there."  (Respondents' Exh. F

2  at 1-2) Contrary to Petitioner's assertion, the factual basis for the first-degree burglary

3  charge included evidence of his intent to use the hammer and knife against Sara's parents.

4         Petitioner further argues that he believed that the charge of first-degree burglary

5  was based solely on the fact that he remained inside the Capp residence with the intention of

6  murdering Sara.  Contrary to this assertion, the indictment indicated that the charge of first-

7  degree burglary was based on Petitioner's act of waiting in the house to murder Sara and

8  waiting in the house with a knife and hammer to use on Sara's parents if they arrived home

9  early.  Specifically, the indictment stated:

10         ISAAC JOHN WILLIAMS MULLINS, on or about the 10th day of February,
       2000, with the intent to commit a theft or a felony therein, entered or remained
11     unlawfully in or on the residential structure of Sara Capp, located at 11406
       W. Crismon Lane, Avondale, Maricopa County, Arizona, while he or his
12     accomplice knowingly possessed an explosive, a deadly weapon, or a dangerous
       instrument, to wit: hammer and/or knife, in violation of A.R.S. § 13-1501, 13-
13     1508, 13-1507, 13-701, 13-702, and 13-801.

14  (Respondents' Exh. A at 2)

15         Additionally, the indictment satisfied the Sixth Amendment's notice requirement

16  because the text of Count 2 tracked the language of Arizona's first-degree burglary statute,

17  A.R.S. § 13-1508[4].  *United States v. Bailey*, 444 U.S. 394, 414 (1980) ("We have held on

18  several occasions that 'an indictment is sufficient it if, first, contains the elements of the

19  offense charged and fairly informs the defendant of the charges against which he must

20  defend, and, second, enables him to plead an acquittal or conviction in bar of future

21  prosecutions for the same offense.' . . .  These indictments, which track closely the language

22  of § 751(a), were undoubtedly sufficient under this standard.") (quoting *Hamling v. United*

23  *States*, 418 U.S. 87, 117 (1974).

24

25  _____

26         [4]  Arizona Revised Statute § 13-1508 provides that "A person commits burglary in the
   first degree if such person or an accomplice violates the provisions of either § 13-506 or § 13-
27  507 and knowingly possesses explosives, a deadly weapon, or a dangerous instrument in the
   course of committing any theft or felony."
28

1    The Sixth Amendment did not require that the indictment specify which felony

2    or felonies Petitioner intended to commit during the burglary.  *United States v. Musacchio*,

3    968 F.2d 782, 787 (9th Cir. 1991)("[T]he government was not required to allege its theory of

4    the case or list supporting evidence to prove the crime alleged . . .In fact, an indictment that

5    sets forth the charged offense in the words of the statute itself is generally sufficient.");

6    *United States v. Sterling*, 742 F.2d 521, 526 (9th Cir. 1984) (holding that "there is no legal

7    requirement that the violations which make up the continuing series be specifically listed in

8    the indictment."); *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982)("The

9    Government need not allege its theory of the case or supporting evidence, but only the

10    essential facts necessary to apprise a defendant of the crime charged.").

11    Moreover, even if the indictment were facially defective, Petitioner is not entitled

12    to relief because he had actual notice of the charges.  "[I]f a defendant has actual notice of

13    the charges, due process may be satisfied despite an inadequate indictment."  *United States*

14    v. *Alvarez-Moreno*, 874 F.2d 1402, 1411(11th Cir. 1989) (quoting United *States v. Becton*,

15    751 F.2d 250, 256 (8th Cir. 1984); see also *Murtishaw v. Woodford*, 255 F.3d 926, 953-54

16    (9th Cir. 2002)(holding that defendant received adequate notice during trial because

17    prosecution advanced new theory of guilt during its opening statement, presentation of

18    evidence, and jury instruction conference, all of which occurred before closing arguments);

19    *Stephens v. Borg*, 59 F.3d 932, 934-36 (9th Cir. 1995) (holding that failure of the indictment

20    to charge felony murder did not violate Constitution when defendant "had five days of actual

21    notice of the prosecution's intent to rely on a felony-murder theory" prior to closing

22    argument); *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992) ("Constitutionally

23    adequate notice of a felony-murder charge could be provided to a defendant by means other

24    than the charging document.").

25    Here, Petitioner had actual notice that the first-degree burglary charge was

26    alternatively based upon his intention to assault Sara's parents with the hammer and knife.

27    Detective Wheeler's grand jury testimony related Petitioner's post-arrest statement

28    explaining that he had picked up the hammer and knife for use against Sara's parents in the

1   event that they had returned home unexpectedly and that he did not plan to use those

2   instruments on Sara (Respondents' Exh. B at 19-20).  Nearly four months before Petitioner

3   entered his guilty plea, on June 13, 2000, Petitioner's defense counsel obtained a copy of the

4   grand jury transcript which included Wheeler's testimony.  (Respondents' Exh. C)

5        Based on the foregoing, Petitioner has not established that he is entitled to habeas

6   corpus relief based in his allegations in Claim 4(b) because the indictment and grand-jury

7   transcript gave Petitioner actual notice of the State's theory concerning the first-degree

8   burglary charge.

9   **V.  Conclusion**

10        Based on the foregoing, Petitioner's Amended Petition for Writ of Habeas

11   Corpus should be denied because Petitioner's claims are either procedurally barred or lack

12   merit.

13        Accordingly,

14        IT IS HEREBY RECOMMENDED that Petitioner's Amended Petition for Writ

15   of Habeas Corpus (docket # 9) be **DENIED.**

16        This recommendation is not an order that is immediately appealable to the Ninth

17   Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

18   Appellate Procedure, should not be filed until entry of the District Court's judgment.  The

19   parties shall have ten days from the date of service of a copy of this recommendation within

20   which to file specific written objections with the Court.  *See,* 28 U.S.C. § 636(b)(1); Rules

21   72, 6(a), 6(e), Federal Rules of Civil Procedure.  Thereafter, the parties have ten days within

22   which to file a response to the objections.  Failure to timely file objections to the Magistrate

23   Judge's Report and Recommendation may result in the acceptance of the Report and

24   Recommendation by the District Court without further review.  *See United States v. Reyna-*

25   *Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

26   / / /

27

28

1
        Failure to timely file objections to any factual determinations of the Magistrate

2
Judge will be considered a waiver of a party's right to appellate review of the findings of fact

3
in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*,

4
Rule 72, Federal Rules of Civil Procedure.

5
        DATED this 10th day of August, 2007.

6

7

8
                        Lawrence O. Anderson
                  United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28